James J. Tutchton (CA Bar No. 150908)
Environmental Law Clinic
University of Denver, Strum College of Law
2255 E. Evans Ave.
Denver, CO 80208
Telephone: (303) 871-7870
Facsimile: (303) 871-6991
Email: jtutchton@law.du.edu

Attorney for Plaintiffs, WildEarth Guardians, and
Rocky Mountain Clean Air Action

Joanne Spalding (CA Bar No. 169560)
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
Telephone: (415) 977-5725
Facsimile: (415) 977-5793
Email: joanne.spalding@sierraclub.org

Attorney for Plaintiff Sierra Club

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| SIERRA CLUB, WILDEARTH GUARDIANS, and ROCKY MOUNTAIN CLEAN AIR ACTION,<br><br>    Plaintiffs,<br>  v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, and DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act Case) |

**INTRODUCTION**

1.  Plaintiffs Sierra Club, WildEarth Guardians, and Rocky Mountain Clean Air Action bring this suit against Dirk Kempthorne, Secretary of the United States Department of Interior, and the United States Department of Interior ("DOI") in order to compel them to comply with the Energy Policy Act of 2005 (the "Energy Policy Act"). In the Energy Policy Act, Congress mandated that Defendants "enter into an arrangement under which the National Academy of Sciences shall conduct a study on the effect of coal bed natural gas production on surface and ground water resources[.]" P.L. 109-58 § 1811(a)(1). Congress mandated that this study be completed by August 8, 2006. Id. at § 1811(d).

2.  In this mandatory duty "deadline" suit, Plaintiffs Sierra Club, WildEarth Guardians, and Rocky Mountain Clean Air Action seek an order compelling the Secretary of Interior to comply with his mandatory duty to obtain the study. The study will contain information that will result in increased protection of public health and welfare from harm caused by the massive growth of coal bed natural gas, which is often referred to as "methane," production in parts of the Western United States.

3.  Defendants' violation of this mandatory duty is particularly egregious given that dramatic rate at which natural gas extraction has increased in the Western United States and the devastating effects that it can cause, both locally and globally via the release of greenhouse gases into the atmosphere.

**JURISDICTION**

4.  Plaintiffs bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, which authorizes civil actions for failure to perform any non-discretionary duty. Thus, this case raises a federal question. Therefore, the Court has subject matter

1

COMPLAINT

1  jurisdiction over the claims pursuant to 28 U.S.C. § 1331 (an action for declaratory, injunctive and other relief arising under the Constitution or laws of the United States).  The relief requested is authorized by 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief).

5.  Defendants have not remedied their violations of the mandatory duty imposed by the Energy Policy Act of 2005 and, thus, are in violation of the APA.  There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

## VENUE

6.  Pursuant to Civil Local Rule 3-2(c), Plaintiffs state that they base venue in this district and assignment to the San Francisco Division on the following: (a) Plaintiff Sierra Club is incorporated in California and resides and maintains its headquarters in San Francisco County in this judicial district; (b) this action seeks relief against federal officials acting in their official capacities; and (c) 28 U.S.C. §§ 1361 and 1391(e) (West 2006) provide for venue in the judicial district of a plaintiff's residence, including the San Francisco Division. There is no real property involved in this action.

## PARTIES

7.  Plaintiff SIERRA CLUB was founded in 1892 and is the nation's oldest grassroots environmental organization.  The Sierra Club is incorporated in California, and has its headquarters in San Francisco, California.  It has more than 710,000 members nationwide, including over 177,000 members in California, 20,500 members in Colorado, 7,300 members in New Mexico, 2,200 members in Montana, 1,000 members in Wyoming, 600 members in North Dakota, and 4,200 members in Utah.

8.  The Sierra Club is dedicated to protecting and preserving the natural and human environment.  One of the Sierra Club's national initiatives is the Wild Legacy Conservation

Initiative, which seeks to engage a broad spectrum of citizens around the value of protecting wildlife, public lands and special places and block threats to these lands from oil and gas drilling, commercial logging, mining, abusive recreation, and overgrazing.

9. The Sierra Club has worked to prevent environmental damage, particularly to water resources, from coal bed methane development for years. The Club successfully litigated to stop the Bureau of Land Management from expanding oil and gas drilling in New Mexico's Otero Mesa, organized to prohibit drilling and mining in the Valle Vidal area of New Mexico's Carson National Forest, and engaged in a notice letter campaign to force companies to clean up numerous dirty well sites in the San Juan basin. The issues surrounding gas drilling in the West fit well within all three of the Club's priority campaigns: to protect public lands and wild places from destructive practices, to move away from our reliance on fossil fuels, and to protect drinking water from toxic substances used during the energy development process. The Sierra Club will continue to fight to protect the environment from the destructive practices of extracting coal bed methane.

10. Plaintiff WILDEARTH GUARDIANS is a non-profit environmental organization, with offices in New Mexico, Colorado, and Arizona. WildEarth Guardians is committed to protecting wild rivers, wild life and wild places in the greater Arid West, including Montana, Wyoming, Colorado, New Mexico, North Dakota, and Utah. WildEarth Guardians participates and will continue to participate in numerous governmental actions involving the production of coal bed methane including commenting on and filing legal challenges to: Resource Management Plans and Amendments to such documents that authorize coal bed methane production on public lands; quarterly lease sale auctions by the Bureau of Land Management for coal bed methane located under surface lands owned by a variety of owners; Applications for Permits to Drill for

coal bed methane; State and county authorizations for production of coal bed methane; and National Environmental Policy Act and Endangered Species Act documents and processes, or lack thereof, regarding the various plans, permits and authorizations.

11. Plaintiffs WildEarth Guardians work and will continue to work to protect wild rivers, wildlife, wild places and ground water from the destructive impacts of coal bed methane production, including the Lesser Prairie Chicken and Northern Aplomado Falcon and the various Wilderness Areas, Citizen Proposed Wilderness Areas and Areas of Critical Environmental Concern throughout the Arid West.

12. Rocky Mountain Clean Air Action is a non-profit corporation with its headquarters in Denver, Colorado. Rocky Mountain Clean Air Action is actively involved in environmental advocacy as part of its mission to protect clean air in Colorado and the surrounding Rocky Mountain region for the health and sustainability of local communities. Rocky Mountain Clean Air Action members and volunteers live, work, recreate and engage in other economic activities throughout the Rocky Mountain region, and are concerned about air quality in the Rocky Mountain Region of the western United States and its effects on the health and welfare of people, plants, and animals.

13. Rocky Mountain Clean Air Action is actively engaged in working to clean up air pollution from oil and gas operations in the Rocky Mountain region, including in relation to coal bed methane production. Rocky Mountain Clean Air Action and its members are concerned that air pollution from coal bed methane is posing threats to human health and welfare, and that a lack of environmental safeguards--including safeguards for surface water and ground water quality--is fueling more air pollution.

14. Plaintiffs' members live, work, recreate, and study, and will continue to live,

work, recreate and study in areas that are adversely affected by coal bed methane production or have been proposed for coal bed methane production or are hydrologically connected to areas where coal bed methane production is currently occurring or is proposed to occur.

15. The acts and omissions of Defendants alleged herein, related to their failure to secure a report on the impacts of coal bed methane production on surface waters and ground waters, deprive Plaintiffs and their members of information guaranteed to the public by the Energy Policy Act of 2005. Plaintiffs and their members are adversely affected by Defendants' failure to make public this legally required information.

16. If Plaintiffs and their members had this information, they would use it to further educate the public about the impacts of coal bed methane exploration and extraction. They would also use the information to advocate for adoption of measures to further reduce or mitigate the impacts of coal bed methane exploration and extraction. Defendants' failure to produce this information as required by the Energy Policy Act of 2005 deprives the Plaintiffs and their members of these benefits and thus causes them injury. Granting the requested relief would redress the injuries described above.

17. Defendant United States Department of Interior is a Department of the Executive Branch of the United States Government. Congress mandated that the Department of Interior perform certain actions under the Energy Policy Act of 2005. The Department of Interior is an "agency" within the meaning of the APA, 5 U.S.C. § 701(b) (West 2008).

18. Defendant Dirk Kempthorne, sued in his official capacity as Secretary of Interior, is charged under P.L. 109-58 § 1811 with entering into an arrangement under which the National Academy of Sciences shall conduct a study on the effect of coal bed natural gas production on surface and ground water resources. If ordered by the court, Mr. Kempthorne has the authority

5

COMPLAINT

and ability to remedy the harm inflicted by Defendants' failure to act.

## LEGAL AND FACTUAL BACKGROUND

19. Coal bed methane is a form of natural gas held in coal seams by water pressure. Water completely permeates the coal beds and its pressure causes the methane to be absorbed onto the grain surfaces of the coal. To extract methane, the water must first be pumped out of the coal seams, which lowers the pressure, allowing the release of methane gas from coal.

20. A hydraulic fracturing technique is employed to extract the largest quantity of methane possible. This technique uses a mixture of water, fluids and sand, which are forced into wells at very high pressures to hydraulically fracture the coal seams. Sand particles in the hydraulic fluid prop up the widened and newly created fractures in the coal, allowing more methane gas to escape after much of the hydraulic fluid and ground water have been pumped out the wells. Hydraulic fracturing fluids cause adverse health effects.

21. There are a number of environmental concerns associated with coal bed methane. One problem is disposing of the large quantities of surplus water, which has high saline or dissolved sediment levels and the hydraulic fracturing fluids. This surplus water is often discharged to surface waters and lands, which may negatively impact the environment and wildlife. In addition, the porosity and permeability that makes many coal formations effective receptacles for methane gas also allow them to hold large quantities of ground water, which often serve as important sources of drinking and irrigation water. Thus, coal bed methane extraction can deplete ground water and contaminate aquifers.

22. Coal bed methane sources exist in the Powder River Basin of Wyoming and Montana, the Greater Green River Basin of Wyoming, Colorado, and Utah, the Uinta-Piceance Basin of Colorado and Utah, and the Raton and San Juan Basins of Colorado and New Mexico,

among other places.

23. The Energy Policy Act of 2005 required the Secretary of Interior to enter into an agreement with the National Academy of Sciences to study the impacts of coal bed methane production on the surface waters and ground waters of certain western states. Specifically, the law provides:

**SEC. 1811. COAL BED METHANE STUDY.**

(a) STUDY.—

(1) IN GENERAL.—The Secretary of the Interior, in consultation with the Administrator of the Environmental Protection Agency, shall enter into an arrangement under which the National Academy of Sciences shall conduct a study on the effect of coal bed natural gas production on surface and ground water resources, including ground water aquifers, in the States of Montana, Wyoming, Colorado, New Mexico, North Dakota, and Utah.

(2) MATTERS TO BE ADDRESSED.—The study shall address the effectiveness of—

(A) the management of coal bed methane produced water;

(B) the use of best management practices; and

(C) various production techniques for coal bed methane natural gas in minimizing impacts on water resources.

(b) DATA ANALYSIS.—The study shall analyze available hydrologic, geologic and water quality data, along with—

(1) production techniques, produced water management techniques, best management practices, and other factors that can mitigate effects of coal bed methane development;

(2) the costs associated with mitigation techniques;

(3) effects on surface or ground water resources, including drinking water, associated with surface or subsurface disposal of waters produced during extraction of coal bed methane;

and

(4) any other significant effects on surface or ground water resources associated with

7

COMPLAINT

    production of coal bed methane.

(c) RECOMMENDATIONS.—The study shall analyze the effectiveness of current mitigation practices of coal bed methane produced water handling in relation to existing Federal and State laws and regulations, and make recommendations as to changes, if any, to Federal law necessary to address adverse impacts to surface or ground water resources associated with coal bed methane development.

(d) COMPLETION OF STUDY.—The National Academy of Sciences shall submit the findings and recommendations of the study to the Secretary of the Interior and the Administrator of the Environmental Protection Agency within 12 months after the date of enactment of this Act, and shall upon completion make the results of the study available to the public.

(e) REPORT TO CONGRESS.—The Secretary of the Interior and the Administrator of the Environmental Protection Agency, after consulting with States, shall report to the Congress within 6 months after receiving the results of the study on—

(1) the findings and recommendations of the study;

(2) the agreement or disagreement of the Secretary of the Interior and the Administrator of the Environmental Protection Agency with each of its findings and recommendations; and

(3) any recommended changes in funding to address the effects of coal bed methane production on surface and ground water resources.

P.L. 109-58 § 1811 (Aug. 8, 2005).

    24.    On October 31, 2007, the Honorable Henry Waxman, Chair of the House Committee on Oversight and Government Reform, wrote to Secretary Kempthorne about his failure to produce the coal bed methane report.

    25.    Rep. Waxman explained that:

> Congress required that the study be completed within one year of enactment and include recommendations for changes to federal law to address adverse impacts of coal bed methane development. Unfortunately, it appears that the Department has failed to comply with this requirement.
>
> The statutorily-mandated study is now 14 months late and has not yet been started. Moreover, documents the Oversight Committee has obtained from the Bureau of Land Management (BLM) indicate that the Administration does not intend to meet the substantive requirements of the Energy Policy Act. Specifically, the documents reveal that BLM is planning to ask the National Academy to conduct a public meeting - not a study as required by law. Under BLM's approach, there will be no study and no recommendations to Congress.

8

COMPLAINT

> This approach is flatly inconsistent with the legal requirements of the Energy Policy Act and the law's mandate for better information on the impacts of coalbed methane development. I am writing to urge you to abandon this approach, to comply with the law, and to immediately contract with the National Academy for a full report with recommendations.

Oct. 31, 2007 Letter from Rep. Waxman to Secretary Kempthorne.

26. Rep. Waxman went on to provide this additional information:

Background

> Natural gas produced from underground coal seams is known as coalbed methane. Unlike conventional gas production that simply taps reservoirs of natural gas trapped in underground geologic formations, coalbed methane is produced from methane that clings to the surface of the coal. A key technique in developing coalbed methane is known as "hydraulic fracturing." Under this practice, a mixture of water, chemicals, and sand is typically forced into a well at high pressure. This mixture, or "fracturing fluid," is put under enough force that it fractures the underground rock formation, allowing natural gas to escape. Ground water is then pumped out of the coal seam in order to decrease pressure on the coal and allow the natural gas to release from the coal and be produced from the well.

> While hydraulic fracturing has been used in conventional oil and gas well development, it raises particular concerns in the context of coalbed methane development. Hydraulic fracturing fluids sometimes contain chemicals that cause adverse health effects. According to EPA, coalbed methane wells tend to be shallower and closer to underground sources of drinking water than conventional oil and gas production wells. Also, hydraulic fracturing of coalbed methane wells actually occurs in underground sources of drinking water across the country.

> Additionally, the ground water pumped out of coalbed methane wells, known as "produced water," raises concerns. Produced water is often high in salt content and if released can adversely affect the environment. Producing water also depletes groundwater sources, a limited resource in the arid West.

> Over the objections of many members, the Energy Policy Act of 2005 exempted hydraulic fracturing from the Safe Drinking Water Act. At the same time, however, the law required the Secretary of Interior to enter into an arrangement with the National Academy of Sciences to "conduct a study on the effect of coalbed natural gas production on surface and ground water resources, including ground water aquifers, in the States of Montana, Wyoming, Colorado, New Mexico, North Dakota, and Utah." The study is required to examine the effectiveness of current management approaches to development, including best management practices and various production techniques, mitigation approaches and their costs, and the effects of coalbed methane development on water

resources, including drinking water. The National Academy of Sciences is also to offer any recommendations for changes to federal law that would be necessary to address adverse impacts to surface or ground water resources associated with coalbed methane development.

The Interior Department's Actions

The National Academy of Sciences study was required to be completed by August 8, 2006, one year after enactment. The study is now l4 months late and has not yet been started. After receiving an inquiry on this matter from the House Oversight Committee on September 5, 2007, the Department of Interior finally decided to proceed with funding the National Academy for limited activity on this subject. However, it appears that the activity that the Interior Department intends to fund does not comply with the requirements of the Energy Policy Act.

In a letter to BLM, the National Academy of Sciences offered four alternatives for work the Academy could do on coalbed methane development. The alternatives ranged in cost from $15,000 to $430,000. The National Academy identified the $430,000 report as "a full Academies report with recommendations, as specified in Section 1811" of the Energy Policy Act of 2005. The $15,000 alternative would be simply a "meeting and oral summary, without recommendations." According to the National Academy, the $15,000 alternative should not even be referred to as a "study" and no written document will be produced as a result of the effort.

Internal documents show that the Bureau of Land Management decided to proceed with the $15,000 option on September 27, 2007. Yet prior to selecting the $15,000 alternative, an internal BLM report found that it would be only "of limited value" to BLM.

It appears that the agency may have selected this alternative based, in part, upon a desire not to divert any resources from approving additional permits for development. According to the BLM report, "The costs for further review by the Academy would have an impact on BLM's ability to provide sufficient funding to process additional oil and gas Applications for Permit to Drill." An internal BLM e-mail suggests that BLM was also concerned that the National Academy review could identify additional needs for studies: "It is implied that based on review and recommendations, additional studies may be recommended that would cost an unknown amount of money."

Conclusion

Although the National Academy of Sciences has offered to produce a "full Academies report with recommendations, as specified in Section 1811" of the Energy Policy Act, BLM has apparently requested that the Academy provide merely a "meeting and oral summary, without recommendations." If BLM stays on this course, not only will the agency fail to meet the clear requirements of the

10

COMPLAINT

> Energy Policy Act, it will also fail to provide the Congress, the states, the public, and affected citizens with a useful analysis of current practices and necessary policy responses. I urge you to abandon BLM's approach and engage the National Academy of Sciences to complete a full report as required by law.

Oct. 31, 2007 Letter from Rep. Waxman to Secretary Kempthorne (footnotes omitted).

## CLAIMS FOR RELIEF

(Violation of the Energy Policy Action of 2005 and the Administrative Procedure Act)

27. Plaintiffs reassert and reallege paragraphs 1 through 26 above.

28. The Administrative Procedure Act, 5 U.S.C. § 702 (West 2008), provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The APA defines "agency action" to include an agency's "failure to act," 5 U.S.C. §§ 701(2), 551(13) (West 2008).

29. The APA, 5 U.S.C. § 706(1) (West 2008), further provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed."

30. The Energy Policy Act of 2005 requires the Secretary of Interior to enter into an arrangement under which the National Academy of Sciences shall conduct a study on the effect of coal bed natural gas production on surface and ground water resources. P.L. 109-58 § 1811(a)(1).

31. The Energy Policy Act of 2005 further requires that the study be completed within 12 months of enactment of the Energy Policy Act of 2005, which was August 8, 2006. Id. § 1811(d).

32. It is after August 8, 2006. Yet, the Secretary of Interior has not entered into an arrangement under which the National Academy of Sciences shall conduct a study on the effect of coal bed natural gas production on surface and ground water resources, including ground water

1  aquifers, in the States of Montana, Wyoming, Colorado, New Mexico, North Dakota, and Utah.

2  Furthermore, the National Academy of Sciences has not submitted the findings and

3  recommendations of the study to the Secretary of the Interior and the Administrator of the

4  Environmental Protection Agency and has not made the results of the study available to the

5  public.

6      33.    Defendants' failures violate P.L. 109-58 § 1811 and constitute agency action

7  unlawfully withheld, unreasonably delayed, and contrary to law and agency action that is

8  arbitrary and capricious within the meaning of the APA.  5 U.S.C. §§ 706(1), (2).

## PRAYER FOR RELIEF

10  WHEREFORE, Plaintiffs respectfully request the Court grant the following relief:

11      A.    A declaratory judgment that Defendants have violated their mandatory duty, under

12  P.L. 109-58 § 1811, by failing to enter into an arrangement under which the National Academy

13  of Sciences shall conduct a study on the effect of coal bed natural gas production on surface and

14  ground water resources, including ground water aquifers, in the States of Montana, Wyoming,

15  Colorado, New Mexico, North Dakota, and Utah;

16      B.    An injunction ordering Defendants, pursuant to an expeditious schedule including

17  interim deadlines, to enter into an arrangement under which the National Academy of Sciences

18  shall conduct a study on the effect of coal bed natural gas production on surface and ground

19  water resources, including ground water aquifers, in the States of Montana, Wyoming, Colorado,

20  New Mexico, North Dakota, and Utah by a date certain that requires the National Academy of

21  Sciences to finish the study by a date certain and make the study available to the public, and

22  prohibiting Defendants from taking actions that may be prejudiced by the lack of the study until

23  the study is complete;

C. In the court's order, retain jurisdiction of this action to ensure compliance with its decree;

D. An award of attorneys' fees and costs to the Plaintiffs pursuant to the Equal Access to Justice Act;

E. Such other and further relief as this Court deems just and proper.

DATED: February 7, 2008                    Respectfully Submitted,

_____
Joanne Spalding (CA Bar. No. 169560)
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
Telephone: (415) 977-5725
Facsimile: (415) 977-5793
Email: joanne.spalding@sierraclub.org

Attorney for Sierra Club

_____
James J. Tutchton (CA Bar No. 150908)
Environmental Law Clinic
University of Denver, Sturm College of Law
2255 E. Evans Ave.
Denver, CO 80208
Telephone: (303) 871-7870
Facsimile: (303) 871-6991
Email: jtutchton@law.du.edu

Attorney for WildEarth Guardians, and
Rocky Mountain Clean Air Action

13

COMPLAINT